29431. LIFE AND CASUALTY INSURANCE COMPANY OF TENNESSEE *v.* HIGDON.

DECIDED JUNE 6, 1942. REHEARING DENIED JULY 22, 1942.

*William Butt,* for plaintiff in error.   *T. H. Crawford,* contra.

SUTTON, J.   Mrs. Hattie B. Higdon, as beneficiary, sued the Life and Casualty Insurance Company of Tennessee Inc. on an insurance policy on the life of Nellie L. Ross.   The policy of insurance contained the provision that "Within two years from date of issuance of this policy the liability of the company under same shall be limited, under the following conditions, to the return of premiums paid thereon: (1) If the insured was not in sound health upon the date of issuance and delivery of this policy. . ." The insurance company denied liability except for a return of the premiums paid on the policy and defended on the ground that the insured was not in sound health on the date of issuance and delivery of the policy, but on the contrary was suffering with syphilis at that time.   The jury returned a verdict for the plaintiff for the amount sued for, and the defendant made a motion for new trial containing only the general grounds.   The motion was overruled, and the exception here is to that judgment.

The sole question for determination is whether or not the insured was in sound health on the date of the issuance and delivery of the policy within the meaning of that term as used in the insurance policy.   The Supreme Court, in *Atlantic & Birmingham Railroad Co.* v. *Douglas,* 119 *Ga.* 658, 661 (46 S. E. 867), said: " 'Good health' is a relative term, and means such a condition of body and mind that the ordinary affairs of life may be attended to without serious strain upon the vital powers.   In life-insurance cases it has been held that 'good health' does not ordinarily mean freedom from infirmity, and that 'good health' or 'sound health' means a state of health free from disease or ailment that affects the general soundness and healthfulness of the system seriously."   And this court in *National Life & Accident Insurance Co.* v. *Smith,* 34 *Ga. App.* 242 (129 S. E. 113), held: "The term 'sound health' as used in a life-insurance policy which provides that there shall be no liability under the policy if the insured is not in sound health at the date of the issuance of the policy, is properly defined in the charge of the court as follows: 'If the insured en-

joyed such health and strength as to justify the reasonable belief that she is free from derangement of organic functions, or free from symptoms calculated to cause reasonable apprehension of such derangement, and to ordinary observation and to outward appearance her health is reasonably such that she may with ordinary safety be insured and upon ordinary terms, the requirement of good health is satisfied. . . The terms "sound health" or "good health," used in a policy, mean that the applicant has no grave impairment or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system.' Under this definition 'sound health' consists not alone in the outward appearance of sound health, but also in a reasonable freedom from physical derangement and impairment as above defined."

Was there any evidence to authorize the jury to find in favor of the plaintiff? To determine this it is not necessary to set out all of the evidence but only a portion of it. The application for the insurance was made November 26, 1940, the policy was delivered on December 9, 1940, and the insured died on January 25, 1941. The plaintiff was the mother of the insured and testified, in part: "Just as far as I know, at the time my daughter signed this application she was in sound health. As far as I know, she was o. k. She was working at that time at the hosiery mill. She had gone to work out there in July sometime. . . As to whether or not up until the date of her death she had complained of being sick or anything—she had not, any more than I had told you, and that was in the last of September or October that she had a spell with her eyes and head. That was just a short time before she taken out the policy that she had the spell with her eyes, and she had to stay off of her work a couple of weeks until she got glasses fit to her eyes. And outside of that she never had been under the care or treatment of a doctor under any circumstances since she was five years old, and she was over that in just a few days and went back to work. As to whether or not she had been up and about the morning that she died and that day—she was well and out the day before, feeling just fine, and had been just right on. She just got out of the bed that morning and fell, but she had been o. k. except maybe a little dizzy headache; that was all the difference there was in her. She went all day and helped at the housework. We

called the doctor that morning when we saw that she was sick. We called Doctor Crawford and he answered the call. We kept her at home then for a short time, and then we carried her to the hospital at Ellijay, and she died in the hospital there. My daughter was twenty-two years old at the time of her death. . . The policy was delivered to her on or about December 9, 1940. She died then on the 24th day of January, 1941, in the hospital at Ellijay, . . with convulsions. . . We had taken her to the hospital about nine o'clock in the morning, and she stayed there until 4.30 the next morning before she died. I stated to Mr. Crawford that so far as I knew she was in sound health; and she acted like she was well at the time. I had no cause to feel any other way about her at the time. I mean by that she was able to work and go about her daily affairs and eating and everything. As to whether she had been complaining some prior to the time or the day just before she got sick and the time she was sent down to the hospital at Ellijay—she had been complaining some just the day before, just a slight headache. But it never kept her from doing her work at the time as she usually does. As to whether or not if she was sick or suffering with any disease—I just simply state that I didn't know anything about it."

Dr. C. B. Crawford testified that he knew the insured in her lifetime and she looked healthy; that he was called to see her on the morning before she died and found her in an unconscious condition, with a convulsion; that he gave her a hypodermic and later gave her an enema and worked with her some two hours, and she was then taken to a hospital at Ellijay and he accompanied her; that his diagnosis was that she was suffering with auto-intoxication, and that this caused her death; that auto-intoxication is poison in the system that throws one into convulsions, and could come from the bowels or kidneys, and he thought hers came from the bowels, judging from the result of the enema he gave her; that he did not know whether she had syphilis or not; did not examine her with reference to that. He further testified: "I stated that I had had experience in the treatment of syphilis. As to how long it takes, after a patient has contracted that disease or come in contact with it, how long it takes to develop and show up—well, I think it depends entirely on the condition of the patient, their general health. If a person were in sound health I would say ten

days to thirty days, and if their condition was bad it would show up even in ten days. If this Nellie Ross had come in contact with this disease before the 9th day of December, or about the 9th day of December, then as to how long I would say it would take it to develop—as I stated I think it would be owing to the condition of her health. I knew the patient, Nellie L. Ross, and she looked healthy, but folks sometimes look healthy that isn't healthy. From the 9th day of December until the 19th day of December, that would be over ten days. As to whether it is possible for this disease to have developed in that time—I would say yes."

J. R. Higdon, husband of the plaintiff, and stepfather of the insured, testified that he was well acquainted with the insured, and that she had lived in his home for sixteen years prior to her death, and that she was in sound health at the time the policy was delivered to her, so far as he knew; that she was healthy and hearty and had been working at the hosiery mill since July or August, 1940, and that if she had syphilis he did not know it.

Mrs. Flora Ray testified that she was public health nurse for Fannin County, and in that capacity took a Wasserman test of the blood of Nellie L. Ross on December 14, 1940, and placed the blood in a Wasserman glass tube, sealed it, and sent it by mail to the Georgia Department of Public Health in Atlanta, Miss Ross's name and the required information being sent with the tube containing the blood; that Miss Ross was an employee of the Van Raalte Mills and it was compulsory for the employees of that mill to have blood tests made, and this was the reason for her going to the public health nurse for a blood test; that she received a report, purporting to be from the State Board of Health in Atlanta, to the effect that the Wasserman test showed that Nellie L. Ross had syphilis, and after receiving that report she assisted Dr. Duckett in giving her a treatment for syphilis on January 7, 1941, and on the 14th and 21st of January, 1941; that Nellie Ross appeared to be in normal health when she went for the blood test on December 14, 1940, and there was no indication that she might then be infected with syphilis, and she seemed surprised when the nurse got the report back and told her what it showed.

Dr. T. F. Sellers, director of the division of laboratories of the Georgia Department of Health, testified as to the method used by the State Board of Health in making tests when furnished with

specimens of blood. He had nothing to do with making the test or analysis of the blood specimen purporting to have been taken from Nellie L. Ross, but he exhibited and attached to his testimony a copy of a record of a serologic test for syphilis showing results as "strongly positive."

Dr. E. L. Webb, serologist of the Georgia Department of Public Health, testified in part: "As to whether or not I made the blood test—one of the technicians actually performed the test under my supervision, and I was present when that was done. To make that test we applied to that specimen a test known as the 'Kahn' test, one of the tests recognized by the United States Public Health Service in the serology of syphilis. . . We do have a record showing the result of that test, what it showed, and I have that here before me. The result of that test was a strongly positive 'Kahn' reaction. And by that I mean that we applied the 'Kahn' test to the specimen of blood submitted to us and obtained, through the use of that test, a strong reaction. As to what disease then that showed that this particular party, Lucile Ross, was suffering with on December 17, 1940, when this specimen of blood was taken from her vein—it showed evidence of syphilitic infection. This examination of this blood was made in the department under my supervision on December 19, 1940. . . As to whether the Wasserman test and the Kahn test are both necessary in determining the factor as to the content of the blood—I would say that either is used as a laboratory procedure. And so far as syphilitic infection is concerned both are recognized as authority. . . There is no way of knowing from the examination of this sample as to the duration of this trouble, as to how long perhaps the patient has been infected. We would have no way of determining that from the examination of the blood, except to that extent related by Dr. Sellers, in that the reaction does not manifest itself in the blood stream until after a few weeks following the invasion of the organism."

Dr. A. K. Duckett testified, in substance, that he was physician for the clinic of the Health Department at Blue Ridge, Georgia, and as such he had occasion to examine Nellie L. Ross, on January 7, 1941, and his examination showed that she was suffering with syphilis at that time, and he gave her an intra-veinous injection of a drug used in the treatment of syphilis, on January 7, 1941, and

again on the 14th and 21st of January, 1941; that in his undertaking to obtain a history of her case, she told him she had suffered with a rash sometime in September, 1940, but it had cleared up and she had no recurrence of it, but along about the middle of December, 1940, she had the appearance of sores in her mouth and on her lips, and those scars were evident at the examination; these lesions appear in syphilis in the mouth and on the inside of the lips. From his diagnosis and the history he obtained from her, he was of the opinion that she was suffering with syphilis when the policy was delivered to her on December 9, 1940, and in his opinion had been infected with it for three or four months before he saw her, but the sores had been in her mouth for only about two weeks—she did not have them on December 9, 1940; that she was responding to the treatment and on January 21, 1941, when he gave her the last treatment, the sores in her mouth were clearing up and they were practically gone at that time; that in view of the fact that he saw her for the first time on January 7, 1941, and two times after that, he was of the opinion that this disease was affecting her general health on December 9, 1940, when the policy was delivered to her; that in his opinion she could not have taken this disease from the 9th of December, 1940, up and until he saw her in January, 1941; it would not have developed on her enough from December 9th to December 20th to show up in a positive blood test.

In *National Life &c. Insurance Co.* v. *Martin,* 35 *Ga. App.* 1 (2) (132 S. E. 120), this court, after quoting the ruling in *National Life & Accident Insurance Co.* v. *Smith,* supra, as to the meaning of the term "sound health," when used in a policy of insurance, said: "Thus, where the assured represents in good faith that he is in sound health, and, on the strength of such representation and upon the opinion of its agent, the policy is issued, and is in good faith accepted by the assured, the policy will not be avoided by reason of the fact that he might have been then afflicted with an incipient, unknown, and fatal malady which had not at that time manifested itself or in any way deranged, impaired, or affected the general soundness and healthfulness of the system."

It is well-settled law that where there is any evidence to support the finding of the jury, and where no error of law appears,

the verdict will not be disturbed by this court. We are of the opinion that under the evidence in this case, and the law applicable thereto, the jury was authorized to find in favor of the plaintiff. Consequently the court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., concurs. Felton, J., dissents.*